No. 18,793.

ESTATE OF LULU LEE VARNUM, DECEASED, HOPE WOODWARD AND MAX V. WOODWARD *v.* MARTHA WITT.

(357 P. [2d] 370)

Decided November 14, 1960.

December 23, 1960, rehearing denied en banc, Mr. Justice Day not participating.

Mr. THOMAS K. HUDSON, Miss ALICE LOVELAND, for plaintiffs in error.

Mr. DAVID J. CLARKE, Messrs. WAGNER & WYERS, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE DAY.

THIS action, commenced in the county court and tried de novo in the district court on appeal, involves an attempt to establish the existence and contents of a purported lost will. The defendant in error, a friend of the deceased, offered the alleged lost will for probate. The caveators — plaintiffs in error here — were related to the decedent as niece and nephew of the half blood. To the action of the court admitting the will to probate after verdict of the jury establishing said will and its contents, the caveators are here on writ of error.

The trial was quite lengthy, and the record voluminous, containing many details of numerous wills purported to have been executed by the deceased. Omitting those matters not pertinent to the disposition of the case, the factual situation was as follows: On March 6, 1956, Lulu Lee Varnum died in Denver, Colorado, possessed of considerable property and leaving neither husband nor children. From August 12, 1953, until her death she was mentally incompetent to conduct her own affairs. Hope Woodward, one of the plaintiffs in error, was a conservatrix of her estate. Upon the death of Mrs. Varnum, Hope Woodward was appointed special administratrix. She offered for probate a 1938 testamentary document purporting to be the last will of Mrs. Varnum, in which the entire estate was left to Mr. Varnum. Be-

cause her husband had predeceased her, the court denied probate. No other will was found. On April 13, 1956, Martha Witt filed her petition for probate of a lost will allegedly executed within one year prior to August 12, 1953.

About six or seven months later, by permission of the court, Martha Witt was permitted to file an "Amended" petition claiming that the contents of the lost will were not as previously alleged but contained entirely different provisions. The one consistent provision of both alleged lost wills was that with the exception of inconsistent small bequests, the entire estate was left to Martha Witt. The first petition alleged that the witnesses to the will were C. B. Carter and Rose Shall. The amended petition stated that there were three witnesses, Laverta H. Carter, C. B. Carter and Rose Shall.

The proponents of the will, having the burden of proving the contents, relied on the testimony of Col. William C. Danks, a lawyer and friend of the decedent, who had drafted the purported will on a typewriter in the home of Mrs. Varnum. As proof of execution, two witnesses, Mrs. Shall and Mr. Carter, were produced to establish that they had been present when Mrs. Varnum had declared a document, *the contents of which they did not see,* to be her last will and testament; that she had signed the document in their presence, and that they had signed in her presence and in the presence of each other. Col. Danks did not know whether the will which he drew had been executed. No witness testified to ever seeing the executed will. Proponents also rely on the testimony of the witness Ruth Woodward who related that Mrs. Varnum had told her right after the death of Mr. Varnum that she had made a will, drawn by Col. Danks, and that it was witnessed by Mr. Carter and Rose Shall. This same witness, however, testified that subsequent to this time she had actually seen and had read the contents of a will in which the attesting witnesses were strangers to her and in which bequests had been

made to a long list of blood donors, each to receive $100; to Varnum $10,000; to Max Woodward $10,000; that the balance of the estate was to *Hope Woodward.* If any reliance is to be placed on the Ruth Woodward testimony, it would establish that the will drawn by Col. Danks was not the last will and had been replaced by the subsequent will which she saw and the contents of which she knew to be different from the will drawn by Danks.

To establish the contents of the will, Col. Danks, after identifying himself, was asked the question if he had ever prepared a will for Lulu Lee Varnum. He replied he *did not know,* that *he might have,* and then he said, "I do not think it was ever executed or I would probably have known about it." At this point in the trial a recess was called and proceedings were had out of the presence of the jury. There counsel for Martha Witt asked permission of the court to examine Col. Danks by leading questions and under cross examination. Counsel stated to the court that he could not claim that Col. Danks was an unwilling or hostile witness, but that apparently he was unable to testify and that his apparent loss of memory should be treated as though he were unavailable as a witness. Counsel requested permission to substitute for Danks' testimony his statements given in the county court as well as testimony given under a discovery deposition taken several months prior to the county court trial.

The court permitted two things to be done: Counsel was allowed to ask witness Danks leading questions and was permitted to read questions and answers given in the deposition by Col. Danks, and to ask if he had, in fact, heard such a question and given such an answer at the time of the deposition. To this line of questioning Col. Danks replied *he could not remember* or sometimes said, "No, I did not say that" and "Something is left out here." Col. Danks also gave the following narration when asked to state the contents of the will:

"It was a short will on the usual form that we use.

And after the payment for debts, which she said had been taken care of, she wanted to leave all of the property including the two apartments, stocks, bonds, and other aggregating about three hundred thousand dollars in value to *Hope Woodward.* Then I asked her about what, if there was anything left besides that. Well she said there might be something, but she thought that would cover it. And, well, that's just about what become of it. I then put the clause on and told her that the will should be signed in the presence of two witnesses and she had two witnesses, of course, in the alley and went over to get them and couldn't find them. In the meantime I went out to change my car or something and came back. She says, 'I have the will and I have signed it, but I can't get those witnesses.' She says, 'They are not here.' 'Lulu,' I says, 'I told you that you should, all three of you, sign in the presence of each other in the same room.' 'Well,' she says, 'You lawyers are so finicky anyhow. I lived with one a long time. I know.' 'All right,' I said, 'that's all.' Now, that will, well, I don't know what ever become of it." (Emphasis supplied.)

With the record at this point hopelessly confused, counsel was permitted to read to the jury the entire deposition of the witness Danks. Without detailing all of the questions and answers, this deposition was, as previously noted, taken as part of a discovery proceedings before trial when proponent was attempting to determine whether a lost will could be proved, and its contents satisfactorily demonstrated to the court. Counsel for the caveators was not present, but had an opportunity to be, and this fact is not fatal. Nevertheless, the deposition reveals that Col. Danks could not even then testify to *the contents* of the will. He was unable to fix any amount of the special bequests although he was positive in his statements that some had been made. The amounts finally arrived at by the counsel examining him were put into the witness' mouth by leading ques-

tions. The suggested amounts appear in several parts of the deposition, but the following questions and answers demonstrate how valueless was the testimony so elicited.

"Q. To the best of your recollection, Colonel, did Mrs. Varnum leave some specific bequest to her sister Hope De Oro? A. Yes, there was something specific. I know roughly what it is. Q. Was it a money gift as far as you remember? A. Well, *I was thinking there was a thousand dollars somewhere.* I don't know where it was. Q. Did she also leave specific bequests to Hope Woodward? A. No. De Oro, who is that? Q. Hope De Oro was her sister. A. Oh, no, no. I was thinking of Hope Woodward. Q. Yes, we have got our 'Hopes' *mixed.* A. Yes. Now, the sister, I don't remember anything except the mention of her name in her will to show that she hadn't forgotten her. But there wasn't any — Q. You mean just *some nominal amount? a dollar or something of that kind?* A. Well, I didn't like the use of a dollar. I *forget what it was, maybe a hundred dollars.* I don't know. Q. *You will say not to exceed a hundred dollars* then, for the sister Hope De Oro? A. Yes, to just show that she recognized her. What she gave — *I am thinking of a thousand or two thousand* to the other Hope. Q. Hope Woodward? A. Yes. Q. Then you would say that was *probably not to exceed two thousand dollars* to Hope Woodward, Colonel? A. Well, I don't know where I got that two thousand dollars, but it seems to me — *I don't remember.* It was some amount that was substantial and then all the residue and remainder, which I know was sizeable, to Martha Witt. And I didn't ask any questions about that." (Emphasis supplied.)

C.R.S. '53, 152-5-29, requires that the proponent of a will establish: 1. That the will has been lost or destroyed or for any other reason is unavailable; 2. that it was properly executed; 3. *proof of the contents,* and 4. that it was in existence at the time of the death of the testator. Failure to prove any *one* of the four elements results in a denial of probate.

There is no proof of the existence of the alleged will at the time of Mrs. Varnum's death. There is proof that a will, the contents of which are unknown, was properly executed before the witnesses Carter and Shall, but there is no proof of the contents of the will they attested. The testimony of Col. Danks was such as to fall short of the proof required in *Eder v. Methodist Ass'n,* 94 Colo. 173, 29 P. (2d) 631. The standard there laid down is that the proof must be "clear and strong." Both were lacking in Danks' deposition and in his testimony at the trial.

Accordingly, the judgment is reversed and the cause remanded to the district court with instructions to dismiss the petition and to remand the cause to the county court for administration of the estate under the intestate laws of Colorado.

MR. JUSTICE KNAUSS and MR. JUSTICE HALL concur.