OPINION OF THE COURT
Peter J. Kelly, S.
By verified petition dated December 18, 2015, Adeline *909 Drescher, Carmela Bove, and Frank R. Certoma, children and distributees of the decedent, seek to probate a copy of an executed testamentary instrument dated November 1, 2008 as the last will and testament of Frank Certoma, Jr. The offered instrument provides in pertinent part for the equal distribution of the decedent’s estate between his children, subject “to a life estate in and to premises located at 161-28 99th Street, Howard Beach, New York” in favor of Carmela. The instrument nominates all of the decedent’s children to act as co-executors.
On September 7, 2016, the petitioners discharged their mutual attorney. Shortly thereafter, both Adeline and Carmela retained new counsel to represent them in this proceeding. Even though Frank had filed a verified petition aligned with his sisters, he elected to hire his own attorney. Thereafter, a hearing was scheduled in this proceeding pursuant to SCPA 1407 to take proof as to whether the instrument could be admitted to probate as a copy of a lost will. Although Frank neither withdrew his petition, nor filed objections to the offered instrument, it soon became apparent that he did not support the provisions of the instrument insofar as Carmela’s life estate was concerned, and was now acting adversely to its admission to probate in contradiction to his prior sworn statements.
More specifically, at the outset of this “uncontested” hearing, counsel for Frank objected to the admission into evidence of the entire court file, which included, in pertinent part, his client’s verified petition seeking the admission of the copy of the instrument to probate, together with his client’s affidavit, wherein he swears under oath to the following:
“That my father, Frank Certoma, Jr., executed his Will on November 1, 2008, a copy of which is attached to this Petition. He then took the original Will with him and kept it in his home located at 161-28 99th Street, Howard Beach, NY. This home was subject to flooding during Hurricane Sandy in 2012, at which time numerous documents were destroyed, including the Original Will.”
Frank was not present at the hearing, and his attorney was unable to provide a legal basis as to why Frank should not be bound by his sworn statements to the court.
With regard to Frank’s petition, “[flacts admitted in a party’s pleadings constitute formal judicial admissions, and are conclusive of the facts admitted in the action in which they are made . . . [A]dmissions ... in pleadings are always in evi *910 dence for all the purposes of the trial of [an] action” (see DeSouza v Khan, 128 AD3d 756, 758 [2d Dept 2015] [internal quotation marks omitted]). Further, Frank’s duly sworn affidavit amounts to an informal judicial admission that, while not conclusive, constitutes some evidence of the facts stated therein (see e.g. Matter of Union Indem. Ins. Co. of N.Y., 89 NY2d 94 [1996]). The entire court file was therefore admitted into evidence.
During the course of the hearing, several witnesses testified and were cross-examined by Frank’s counsel. Among the witnesses called was Laurie Culhane, a first cousin of the petitioners and a niece of the decedent. She also worked for the attorney who drafted the decedent’s will, which she then personally typed. Upon review of the offered instrument, Laurie confirmed that the copy was a true and complete copy of the original she had typed and witnessed. She also related that the decedent expressly indicated that he wanted Carmela, the named life tenant in the instrument, to “be protected” and able to live in the house “until she chose to sell it or was deceased.”
Laurie testified that the execution of the original instrument took place at the decedent’s home under the supervision of the attorney draftsperson, Neal Schwarzfeld, in her presence and in the presence of the other two attesting witnesses, who were her husband Matthew Culhane, and Adeline’s husband, David Drescher. She identified her handwriting on the instrument as well as the self-proving affidavit. She testified that the document was declared by decedent to be his last will and testament and that he signed it in her presence and the presence of the other attesting witnesses, who in turn, at the decedent’s request, signed as witnesses in each other’s presence. Further, she testified that the decedent had the capacity to make a will.
According to Laurie, right after the execution ceremony, the original executed instrument was brought back to the office of the attorney draftsperson for the purpose of making a copy. The following Monday, Laurie personally delivered the original will to the decedent. Upon handing it to him, she observed the decedent bring the original will into his bedroom located on the first floor of his home at 161-28 99th Street, Howard Beach, New York.
Laurie’s husband, Matthew, also an attesting witness, testified in similar fashion. Upon review, he identified his signature on the offered instrument as well as the self-proving affidavit. *911 He testified that the copy was a true and accurate representation of the original instrument he witnessed. His testimony was consistent with that of Laurie’s and corroborative of all of the elements of due execution and testamentary capacity. He too related that one of the decedent’s main reasons for the will was to make sure Carmela could stay in the home.
With regard to what became of the original instrument, petitioners offered the testimony of Carmela’s daughter, Diana Oliveri. Diana testified that she and her son “rode out” Hurricane Sandy with Carmela and the decedent at the decedent’s home. At the time of the storm, the decedent occupied the first floor of the home and Carmela occupied the second floor.
Diana testified in chilling detail about the events that transpired upon Hurricane Sandy’s arrival. Namely, water flooding in through the doors and windows of the first floor of the home and the decedent’s insistence in remaining there until the rising waters gave him no choice but to retreat to the second floor for safety, taking with him but two precious personal items: a photograph of his wife and his father’s humidor. She further described the banging and crashing noises as the first floor was methodically destroyed by the incursion of water, and the fear she experienced as the water continued to rush in and climb steadily up the stairs leading to the second floor.
Photographs of the decedent’s residence taken the day after the storm by Carmela’s daughter Alison—after voir dire by Frank’s attorney—were admitted into evidence without objection. They depict the water line on the exterior of the house as reaching halfway up the windows as well as the destruction of the first floor of the home. The contents of the entire first floor, consisting of the decedent’s personal belongings, could not be salvaged. According to Diana, the decedent was taken to another family member’s house immediately after the storm subsided and access was possible. Thereafter, Diana, together with other relatives, including Frank, undertook the task of removing the destroyed contents of the first floor previously occupied by decedent and placing them on the curb for disposal. The photographs demonstrate the extent of the ruin and the piles of debris. According to Diana “everything was destroyed . . . memories gone.” Nothing was left behind. “Everything had to go.”
Returning to Laurie’s testimony, in the weeks subsequent to Hurricane Sandy, the decedent, who was temporarily residing *912 with Laurie’s parents, told her “my will is destroyed” and asked if she could get a copy. Laurie obtained a copy of the decedent’s will from the attorney draftsperson’s office and delivered it to the decedent approximately one month later, when the decedent had returned to his residence. The decedent, whom she described as “grateful,” thanked her for bringing it.
Turning now to the relevant law, the requirements necessary to admit a lost or destroyed will to probate are set forth in SCPA 1407 which provides that a copy may be admitted to probate only if it has been established that the will has not been revoked; execution of the will is proved in the manner required for the probate of an existing will; and all of the provisions of the will are clearly and distinctly proved by each of at least two credible witnesses, or by a copy or draft of the will proved to be true and complete.
That the second requirement was met is not subject to dispute. The instrument has an attestation clause and was attorney supervised,* affording it a presumption of regularity (see e.g. Matter of Templeton, 116 AD3d 781 [2d Dept 2014]). This, coupled with the corroborative testimony of two attesting witnesses, satisfied petitioners’ burden in this regard. Additionally, there was no disagreement that the third requirement was met. Namely, that all of the provisions of the will were clearly and distinctly proved. The testimony of the attesting witnesses demonstrated that the copy offered was a true and complete representation of the original.
As to the first requirement, petitioners were required to demonstrate that the will had not been revoked. Generally, a presumption of revocation arises when a testamentary instrument, known to have been in possession of the testator prior to death, cannot be located after death (see e.g. Collyer v Collyer, 110 NY 481 [1888]). Here, where it is alleged that the decedent’s will was destroyed during his lifetime, petitioners were required to provide proof that the testator, or someone acting at his direction, had not revoked the will (see Matter of Fox, 9 NY2d 400 [1961]).
Based on the facts presented, the court finds petitioners have clearly and convincingly proved that the original will was not revoked by or at the testator’s direction, but rather was *913 destroyed by a force of nature (see e.g. Matter of Morel, 2015 NYLJ LEXIS 4591 [Sur Ct, NY County 2015]). Whatever remained of the original instrument after the storm, if anything, was discarded by decedent’s family members along with all of the unsalvageable contents of the first floor of the decedent’s home (see Matter of Markman, 2014 NYLJ LEXIS 1602 [Sur Ct, Bronx County 2014]).
The closing argument made by Frank’s counsel, alleging that the decedent’s failure to execute a new original will prior to death somehow amounted to a revocation, is wholly without merit, constitutes pure speculation and conjecture (see EPTL 3-4.1; Matter of Fox, 9 NY2d 400 [1961]; Matter of Tremain, 169 Misc 549 [Sur Ct, Westchester County 1938]), and stands in stark contrast to Frank’s verified petition and prior affidavit.
Accordingly, the court finds that on November 1, 2008, the decedent duly executed a will in conformity with the requirements of EPTL 3-2.1 and that at the time of its execution, he was in all respects competent to make a will and not under restraint. The copy of the will offered for probate is a true and complete copy of the decedent’s original will. Further, the court finds that decedent’s original will was not revoked by the testator.
The petition is granted and the copy of the destroyed will is admitted to probate as the decedent’s last will and testament. Letters testamentary shall issue to petitioners upon their duly qualifying.

 This hearing was originally scheduled for March 14, 2017, at which time the attorney draftsperson had flown in from California to New York to testify. Unfortunately, the hearing was not held on that day due to a snowstorm resulting in the court’s closure. Ultimately, his testimony was not necessary.